**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| JOYCE E. HOLMES, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 08-4624 |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

**Memorandum**

YOHN, J.                                                                April 28, 2010

Plaintiff, Joyce E. Holmes, appeals the denial of her claim for Social Security Disability

Insurance benefits ("DIB") by the Commissioner of Social Security ("the Commissioner"). She

seeks judicial review pursuant to 42 U.S.C. § 405(g) (2006). I referred the matter to a magistrate

judge, who submitted a Report and Recommendation ("R&R") recommending that I affirm the

Commissioner's decision. Plaintiff filed objections to the R&R. Plaintiff argues in her objections

that the Administrative Law Judge's ("ALJ's") determination lacked substantial evidence to

support it because it: (1) improperly rejected the results of an MRI report showing pressure on

plaintiff's spinal cord; (2) failed to conduct a sufficient analysis of the effects of plaintiff's

obesity; (3) provided insufficient support for its conclusion that plaintiff was not fully credible;

(4) rejected the opinions of plaintiff's treating physicians without substantial contradictory

evidence; and (5) failed to perform an adequate function-by-function analysis of plaintiff's

residual functional capacity ("RFC"). I conclude that the ALJ's discussion of plaintiff's obesity

and analysis of RFC were once again inadequate. Accordingly, I will remand the matter to the

Commissioner for further decisionmaking consistent with this opinion.

## I. Factual and Procedural Background[1]

Plaintiff's DIB claim has a lengthy procedural history—spanning over thirteen years—and has already come once before this court. I addressed plaintiff's case in 2006, on her first appeal to this court. *See Holmes v. Barnhart*, No. 05-5214, 2006 U.S. Dist. LEXIS 79826 (E.D. Pa. Nov. 1, 2006). Because my previous opinion includes a detailed discussion of plaintiff's procedural history up until 2006, I will provide only a summary here.

Plaintiff is a 57-year-old woman with past work experience as a bank authorization clerk, distribution clerk, and encoding operator. Plaintiff has not engaged in substantial gainful activity since May 13, 1996, when she claims she became disabled due to neck and back problems. She last met the insured status requirements of the Social Security Act on December 31, 2001. As a result, she must show that she became disabled before that date in order to be entitled to DIB.

Plaintiff complains of severe neck pain that radiates to her shoulder and arms. Plaintiff's primary physician, Henry Sadek, D.O., who submitted treatment notes from 1996 to 2003, diagnosed cervical radiculopathy and has noted limitations in cervical range of motion, muscle spasms, and diminished reflexes. He also reported that plaintiff had normal sensation and no muscle atrophy. The notes of Robert Hudrick, D.O., who also treated plaintiff from 1996 to 1997, are not fully consistent with those of Dr. Sadek, as Dr. Hudrick found plaintiff to retain full range of cervical motion. Dr. Hudrick did note that plaintiff suffered from tenderness and spasms. Dr. Hudrick found plaintiff to be neurologically normal, with the exception of mildly diminished power in her right upper extremity. On March 22, 1999, plaintiff was examined by Martin

---

[1] For the purposes of this opinion, unless otherwise specified, all facts are derived from the ALJ's findings in her determinations dated August 5, 2004 (("2004 ALJ Dec.")), and August 27, 2007 ("2007 ALJ Dec.")), and from my previous recitation of plaintiff's procedural history in *Holmes v. Barnhart*, No. 05-5214, 2006 U.S. Dist. LEXIS 79826 (E.D. Pa. Nov. 1, 2006). Accordingly, I cite only to portions of the record not previously cited.

Goldstein, D.O., a consulting neuropsychiatrist. Dr. Goldstein found that plaintiff suffered from uniformly diminished reflexes, but did not make any comments regarding plaintiff's cervical range of motion and found plaintiff to have normal strength and sensation, with no muscle atrophy or spasms. An August 1, 1996, MRI of plaintiff's cervical spine showed multilevel "mild disc bulges with posterior osteophyte formation," causing "mild" impression on the thecal sac and spinal cord at the C4-5 level. (R. 306-07.) A consulting neurologist, Dewey Nelson, M.D., stated that 52% of the normal population have cervical bulges.

Plaintiff also complains of lower back pain. A June 12, 1997, MRI of Holmes's lumbar spine showed "no evidence of disc bulge or herniation" but some "degenerative changes" at the "facet joints at the L5-S1 level, right greater than left."[2] (R. 349.) Dr. Sadek has diagnosed plaintiff with lumbar strain. Dr. Nelson has concurred with that diagnosis and, in addition, diagnosed plaintiff with spondylosis of the L5-S1 disc. Dr. Sadek reported some limitations in plaintiff's range of motion, but Dr. Goldstein found only mild limitations, and Dr. Hudrick found none. Dr. Sadek and Dr. Hudrick reported that plaintiff's gait was normal, but Dr. Goldstein noted that plaintiff's gait was wide and "waddling" as a result of her obesity. While Dr. Sadek reported that plaintiff experienced muscle spasm and had somewhat decreased muscle power, Dr. Goldstein reported no problems in these areas. Both Dr. Sadek and Dr. Goldstein agreed that plaintiff had somewhat diminished reflexes. All three examining physicians found that plaintiff experienced no muscle atrophy. Moreover, Dr. Hudrick found tenderness in the lumbar region.

---

[2] An additional MRI conducted in 2003 showed "mild degenerative disc disease at L5-S1 and at T11-12," and, most prominently, "facet osteoarthrosis at L5-S1." (R. 24.) The ALJ noted that this MRI was "performed almost two years after the date-last-insured," which was December 31, 2001, and "merely reflected even then 'mild' changes without express compromise of a nerve root or the spinal cord." (2007 ALJ Dec. 5.)

Although plaintiff reported using a cane since sometime in 1996, Dr. Sadek opined in April 1997 and September 1998 that plaintiff had no need for one, only finding that a cane was necessary in May 2003.

In addition to her orthopedic impairments, plaintiff is obese, with a height of five feet and six inches and a weight varying between 206 and 230 pounds over the course of her claimed period of disability.

Aside from the MRIs and physical examinations performed by plaintiff's examining physicians, no imaging or other diagnostic tests, such as electromyograms or nerve conduction studies, have been performed. Moreover, between plaintiff's alleged onset date and her date last insured, she has primarily treated her pain with acupuncture, heat massage, and pain medications or anti-inflammatories such as Relafen, Motrin, and Daypro.

Plaintiff filed her first application for DIB on December 9, 1996, alleging that she experienced neck and back pain starting on May 13, 1996. An ALJ held a hearing on November 11, 1998, and issued an unfavorable decision on August 19, 1999. On July 11, 2000, while her appeal of the first application was pending before the Appeals Council, plaintiff filed a second DIB application, alleging the same impairments. The Social Security Administration issued a favorable decision on that application on February 16, 2001, with a finding of disability beginning on August 20, 1999, the day after the ALJ's unfavorable decision on Holmes's first DIB application.

On August 26, 2002, the Appeals Council vacated the unfavorable determination from August 19, 1999, reopened the favorable decision from February 16, 2001, consolidated both applications, and referred the matter to the ALJ for another hearing. That hearing resulted in another unfavorable decision on July 11, 2003.

The Appeals Council vacated that decision and remanded to another ALJ, who also issued an unfavorable decision on August 5, 2004. The Appeals Council denied plaintiff's request for review on August 3, 2005. Plaintiff appealed to this court. On November 1, 2006, I remanded the matter to the Commissioner for further decisionmaking. *See Holmes*, 2006 U.S. Dist. LEXIS 79826. I concluded that the ALJ had provided an inadequate basis for her rejection of the opinions of plaintiff's treating physicians, Dr. Sadek and Dr. Goldstein. I also concluded that a medical expert, Stanley Askin, M.D., gave improper testimony by focusing on whether plaintiff would benefit from working rather than on whether her medical condition could reasonably produce her allegedly disabling pain. *See Leslie v. Barnhart*, 304 F. Supp. 2d 623, 629 (M.D. Pa. 2003). It was unclear to what extent this testimony influenced the ALJ's decision. I further concluded that the ALJ did not properly address Holmes's obesity in her RFC determination at step four, as required by the Social Security Administration's Policy Interpretation Ruling, S.S.R. No. 02-01p (2002) ("S.S.R. 02-01p"). Finally, I concluded that the ALJ erred in failing to discuss the results of an MRI of Holmes's lumbar spine conducted around September 9, 2003.

On remand, the ALJ conducted another hearing with a new medical expert, Donald I. Goldman. Dr. Goldman, a board-certified orthopedic surgeon, testified that there was little objective medical evidence of a serious orthopedic impairment, that obesity was not a contributing factor in producing plaintiff's pain, and that plaintiff's symptoms were likely caused by some other impairment such as fibromyalgia or diabetic neuropathy. (R. 686-709.) Dr. Goldman concluded that plaintiff was not disabled from an orthopedic standpoint and that the opinions of her examining physicians were not medically supported. (*Id.*)

Subsequent to that hearing, the ALJ issued another unfavorable decision on August 27, 2007. The ALJ found that plaintiff's obesity, cervical spine impairment, and lumbar spine impairment were "severe," but that plaintiff retained the RFC to perform sedentary work. The ALJ specifically credited Dr. Goldman's testimony to the extent that it conflicted with the opinions of Dr. Sadek and Dr. Goldstein.

The Appeals Council denied review and plaintiff appealed again to this court. I referred the matter to a magistrate judge, who recommended that I affirm the decision of the Commissioner. Plaintiff has objected to the magistrate judge's recommendation.

## II. Legal Standard

### A. Standard of Review

A district court reviews *de novo* the parts of the magistrate judge's report and recommendation to which either party objects. 28 U.S.C. § 636(b)(1). The district court may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. *Id.*

In contrast, the district court may only review the ALJ's final decision in order to determine "whether that decision is supported by substantial evidence." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). This standard of review is deferential. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hartranft*, 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552 (1988)). The court may not "weigh the evidence," *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), and "will not set the Commissioner's

decision aside if it is supported by substantial evidence, even if [the court] would have decided the factual inquiry differently," *Hartranft*, 181 F.3d at 360.

In making this determination, however, the court must consider "the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding." *Monsour*, 806 F.2d at 1190. "A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Before a district court can review the record to determine if the Commissioner's final decision is supported by substantial evidence, the Commissioner must provide an explanation for his or her findings in order to allow for meaningful judicial review. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000) (holding that an ALJ must "set forth the reasons for his decision"). The ALJ cannot simply state a conclusion "without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning." *Id.* The Third Circuit has stated that "we need from the ALJ not only an expression of the evidence [he] considered which supports the result, but also some indication of the evidence which was rejected. In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). Without such information, the ALJ's findings are "beyond meaningful judicial review." *Burnett*, 220 F.3d at 119. Without the ability to meaningfully review the ALJ's conclusions, a court is compelled to "vacate and remand the case for a discussion of the evidence and an explanation of [the] reasoning supporting" those conclusions. *Id.* at 120.

**B. Standard for Disability Determination**

To qualify for DIB disability insurance payments, a claimant must have a disability. 42 U.S.C. § 423(a)(1)(E). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). The impairment or combination of impairments must render the claimant unable either to return to his previous work or, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

When evaluating a claim for disability benefits, the Commissioner applies a five-step sequential analysis: (1) whether the claimant worked during the alleged period of disability, (2) whether the claimant has a "severe medically determinable physical or mental impairment," (3) whether the impairment meets the requirements of a "listed impairment" found in 20 C.F.R. Part 404, Subpart P, Appendix 1, (4) whether the claimant can continue to perform "past relevant work," and (5) whether the claimant can perform "other work" in the national economy. 20 C.F.R. § 404.1520(a)(4) (2008); *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000). The claimant bears the burden of proof at steps one, two, and four.[3] If the claimant satisfies these requirements, the burden of production shifts to the Commissioner to show that the claimant is capable of performing other work available in the national economy. *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).

---

[3] Technically, neither party bears the burden of proving step three because "step three involves a conclusive presumption based on the listings." *Sykes*, 228 F.3d at 263 n.2. *But see Montgomery v. Comm'r of Soc. Sec.*, No. 07-4500, 2009 U.S. Dist. LEXIS 54976, at *10-12 n.3 (D.N.J. Mar. 5, 2009) (criticizing *Sykes* and holding that the claimant also bears the burden of proof at step three).

If the claimant's impairment does not meet or equal a listed impairment, the Commissioner must assess at step four the claimant's RFC, a measure of what the claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1). The RFC is an "assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on regular and continuing basis," equivalent to eight hours per day, five days per week. *See* Soc. Sec. Admin., Policy Interpretation Ruling, S.S.R. No. 96-8p (1996) ("S.S.R. 96-8p"); 20 C.F.R. § 404.1545(b), (c). The ALJ first identifies the individual's restrictions and abilities on a "function-by-function basis," including functions such as "sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions," mental activities such as understanding and carrying out instructions, and any applicable restrictions on the individual's work environment. S.S.R. 96-8p; 20 C.F.R. § 404.1545(b), (c), (d). "Only after that may RFC be expressed in terms of the exertional levels of work" such as "sedentary," "light," or "heavy." S.S.R. 96-8p. In assessing the claimant's functional restrictions, the ALJ must consider the combined effect of all of a claimant's medically determinable impairments, including clinical obesity. 20 C.F.R. § 404.1545(a)(2); *Burnett*, 220 F.3d at 122; S.S.R. 02-01p.

The severity of the claimant's symptoms[4] may be relevant to the ALJ's RFC determination. *Burnett,* 220 F.3d at 121-23. When a claimant's alleged disability is based in part on pain or other subjective symptoms, the ALJ must conduct a two-step analysis to evaluate the claimant's symptoms. 20 C.F.R. § 404.1529(b), (c). First, the Commissioner must determine whether the claimant has a "medically determinable impairment that could reasonably be

---

[4] In the Social Security context, the term "symptom" is a term of art that refers to a claimant's own description or experience of an impairment. *See* 20 C.F.R. §§ 404.1528(a), 404.1529.

expected to produce" the claimant's symptoms. *Id.* § 404.1529(b). The claimant must present objective "medical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques," which "show the existence of" such an impairment. *Id.*[5] This analysis, however, "does not involve a determination as to the intensity, persistence, or functionally limiting effects of [a claimant's] symptoms." *Id.* Next, the Commissioner must consider "all of the available evidence," including the claimant's testimony and other non-medical evidence, in order to determine the actual intensity and persistence of the symptoms caused by the claimant's impairment or impairments and the degree to which those symptoms interfere with the claimant's ability to work.[6] *Id.* § 404.1529(c). Although the claimant's alleged symptoms must be "consistent" with the objective medical evidence and other evidence, the Commissioner "will not reject [a claimant's] statements about the intensity and persistence of . . . pain or other symptoms or about the effect [those] symptoms have on [a claimant's] ability to work solely because the available objective medical evidence does not substantiate [those] statements." *Id.* § 404.1529(c)(2); *see also Burton v. Bowen*, 704 F. Supp. 599, 603 (E.D. Pa. 1989) ("[S]ubjective complaints of pain . . . need not be fully confirmed by objective medical evidence in order to be afforded significant weight.") (citing *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981)). Because the RFC determination may ultimately be dispositive of an

_____

[5] This language is taken directly from the statutory definition of disability. *See* 42 U.S.C. § 423(d)(5)(A) (requiring "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged").

[6] Non-medical evidence can include: the claimant's daily activities; the circumstances of the claimant's symptoms, including location, duration, frequency, intensity, and precipitating and aggravating factors; medication and other treatments for the symptoms; and medical and non-medical measures taken to relieve the symptoms. 20 C.F.R. § 404.1529(c)(3).

individual's social security claim, the Commissioner need not adopt any particular doctor's or expert's opinion on a claimant's RFC. 20 C.F.R. § 404.1527(e).

After calculating the claimant's RFC, the ALJ compares the claimant's RFC to the requirements of the claimant's past jobs in order to determine whether the claimant can return to that previous work. If not, the ALJ moves on to step five, at which point he considers the claimant's RFC, physical ability, age, education, and work experience in order to determine whether the claimant can perform any other "substantial gainful work that exists in the national economy." *Id.* §§ 404.1520(g); 404.1511(a).

## III. Discussion

Plaintiff objects that the ALJ: (1)improperly rejected an MRI report finding pressure on plaintiff's spinal cord; (2) failed to explain her reasoning regarding the impact of plaintiff's obesity on her RFC; (3) failed to explain her finding that plaintiff's complaints were not credible; (4) improperly rejected the opinions of plaintiff's treating and examining physicians; and (5) failed to conduct a new function-by-function analysis of plaintiff's limitation in calculating her RFC. (Pl.'s Obj. To Report & Recommendation of Magistrate Judge ("Pl.'s Obj.").

I conclude that the ALJ's conclusions regarding the weight accorded to plaintiff's treating physicians, the existence of pressure on plaintiff's spinal cord, and plaintiff's credibility were supported by substantial evidence. I agree, however, that the ALJ failed to conduct a sufficient analysis of the effects of plaintiff's obesity, particularly the extent to which plaintiff's obesity may have caused more pain and limitation than might be expected from the neck and back impairments alone. *See* S.S.R. 02-01p. The ALJ's conclusory statement in her more recent decision that she had previously taken plaintiff's obesity into account is insufficient to correct that error. Moreover, because it is uncertain how the ALJ would have conducted her function-by-

function analysis of plaintiff's limitations if obesity had been properly considered, the ALJ's RFC determination, on which she based her opinion that plaintiff can return to her previous work, lacks substantial evidence to support it.

### A. Pressure on Plaintiff's Spinal Cord

In her 2007 decision, the ALJ stated that, according to Dr. Goldman, there was "no evidence of pressure on the spinal cord." (2007 ALJ Dec. 5.) Plaintiff argues that Dr. Goldman's testimony did not state that there was "no evidence" of pressure on the spinal cord and notes that an MRI report dated August 1, 1996, includes a finding of pressure on plaintiff's spinal cord at the C4-5 level. (R. 307.) As a result, plaintiff argues that the ALJ lacked substantial evidence for her finding that there was no pressure on plaintiff's spinal cord. I conclude that any inconsistency between the ALJ's findings and the medical evidence is harmless.

The MRI report to which plaintiff refers found "mild impression upon the cervical cord at this [the C4-5] level." (R. 307.) When questioned about that MRI report, Dr. Goldman stated that the "actual wording [of the report] is kind of interesting" with regard to whether there was any impression on the cervical cord, and that there was "a question of whether there was putting pressure on the cord, and that's why I asked you [plaintiff's counsel] before was an EMG[7] ever done." (R. 687.) Dr. Goldman testified that impression on the spinal cord could be confirmed by a follow-up test such as an EMG or nerve conduction study—neither of which had been performed in plaintiff's case—and would be expected to cause symptoms, such as muscle atrophy or reflex deficits, that were absent in plaintiff's medical record. (R. 687, 691-92.)

---

[7] "EMG" is an abbreviation for electromyogram, a diagnostic test that records the electrical "activity . . . of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation." *Dorland's Illustrated Medical Dictionary* 609 (31st ed. 2007).

Dr. Goldman's testimony supports an inference that any impression on plaintiff's spinal cord was of minimal clinical significance. The MRI showed only mild impression on plaintiff's cervical spinal cord, and plaintiff's medical record did not document any serious symptoms attributable to pressure on the cord. As a result, although the ALJ's statement that there was "no evidence" of pressure on plaintiff's spinal cord was not entirely accurate, her ultimate inference—that plaintiff did not suffer from debilitating pressure on her cervical spinal cord—was supported by substantial evidence.

### B. The ALJ's Consideration of Obesity

Plaintiff objects that the ALJ's evaluation of the effects of plaintiff's obesity was "overly generalized" and did not satisfy the court's instruction that the ALJ explicitly address Holmes's obesity in her RFC determination. (Pl.'s Obj. 3 (citing *Holmes*, 2006 U.S. Dist. LEXIS 79826, at *40).) Plaintiff argues that the ALJ failed to provide "any additional insight into the way obesity was considered, and whether that consideration was supported by substantial evidence." (Pl.'s Obj. 4 (citing S.S.R. 02-01p).) I agree and will remand the matter to the Commissioner for further decisionmaking consistent with this opinion.

An ALJ must consider the effects of a claimant's obesity at all stages of the disability determination process, including when assessing a claimant's RFC. S.S.R. 02-01p. Obesity itself may cause limitations in "exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling," as well as in "postural functions, such as climbing, balance, stooping, and crouching." *Id.* It may also cause fatigue, which affects the claimant's "physical and mental ability to sustain work activity." *Id.* The "combined effects of obesity with other impairments may be greater than might be expected without obesity." *Id.* For example, "someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be

expected from the arthritis alone." *Id.* Where, as here, the claimant raises the issue of obesity before the ALJ and the ALJ finds at step two that the claimant's obesity is a severe impairment, the ALJ must explicitly discuss the effects of obesity at all subsequent steps. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009). That discussion may be brief but must, at the very least, discuss not only *whether* obesity exacerbates the claimant's other impairments but also *to what extent* it does so. *Id.* at 504-05.

Plaintiff has testified that her obesity affects her ability to stand and walk "a whole lot," causes her to feel "tired," "exhausted," and "out of breath" when she moves around, and otherwise limits her overall mobility. (R. 160.) Plaintiff has also elicited medical expert testimony that her obesity complicates her neck and back impairments, resulting in increased pain. (*See, e.g.*, R. 183, 185 (testimony of Dr. Askin) ("[I]f you think about it, it's like taking [a] 100-pound person and strapping 100 extra pounds on that person [and] making that person carry that weight everywhere she goes. Would that hurt? Absolutely. It's like carrying a ball and chain . . . .").)

In her 2004 decision, the ALJ did not explicitly address the effects of plaintiff's obesity in her RFC analysis, despite considering them at earlier steps. (2004 ALJ Dec. 3, 5-8.) Because I was "unable to conclude that an explicit discussion of Holmes' obesity at step four would not affect the outcome" of the ALJ's decision, I remanded to the ALJ for explicit consideration of Holmes's obesity at step four. *Holmes*, 2006 U.S. Dist. LEXIS 79826, at *36-37.

On remand, the ALJ stated that "[i]n crafting a residual functional capacity for sedentary work, I deliberately factored in [plaintiff's] significant obesity as I assumed that it must have contributed adversely to functioning. (I see no reason to quantify whether it per se reduced functional abilities from medium to light or from light to sedentary. Also, see the testimony below.)" (2007 ALJ Dec. 5.) That testimony was that of Dr. Goldman, a board-certified

orthopedist. (*Id.*) According to the ALJ, Dr. Goldman testified that "[o]besity may or may not matter" in cases such as plaintiff's, where, according to Dr. Goldman, there was "medical evidence of lumbar arthritis and cervical changes" but "no evidence of pressure on the spinal cord" and "the record as a whole lacked evidence of anything else." (*Id.* at 5-6.) The ALJ noted that Dr. Goldman felt that obesity "should have caused limitation of motion *if* it were relevant, but it did not," but disagreed with Dr. Goldman on this issue because "Dr. Sadek repeatedly reported limitation of motion as did Dr. Goldstein." (*Id.* at 6.)

Because the ALJ found, contrary to Dr. Goldman's testimony, that obesity was relevant to the intensity of plaintiff's orthopedic symptoms, the ALJ was required to consider the effects of obesity in her RFC analysis and to "explain how [she] reached [her] conclusions on whether obesity caused any physical and mental limitations." S.S.R. 02-01p. She did not. The ALJ's mere statement that she assumed plaintiff's obesity contributed adversely to her functioning to some degree was insufficient to satisfy the requirements of S.S.R. 02-01p. Although I agree with the ALJ that there was no need to "quantify whether it per se reduced functional abilities from medium to light or from light to sedentary" (2007 ALJ Dec. 5), the ALJ was required at least to address in some detail the effect of plaintiff's obesity on her musculoskeletal symptoms and whether obesity caused those symptoms to be more intense or persistent than would otherwise be expected in a non-obese patient. *See, e.g., Elam v. Astrue*, No. 08-4663, 2009 U.S. Dist. LEXIS 79070, at *4 (E.D. Pa. Sept. 2, 2009) (at step three and all subsequent steps, the ALJ must "explicitly examine the interplay" between obesity and other impairments, especially musculoskeletal, respiratory, and cardiovascular impairments); *Morris v. Barnhart*, No. 03-4836, 2004 U.S. Dist. LEXIS 9931, at *13 (E.D. Pa. May 10, 2004) ("[A] determination that does not

consider how the combination [of obesity and other impairments] affects the Plaintiff is not supported by substantial evidence.").

The ALJ's failure to address the degree to which plaintiff's obesity exacerbated her other limitations was especially problematic in light of the fact that the ALJ based her ultimate RFC determination in part on a finding that plaintiff's "orthopedic problems did not support the severity of her complaints." (2007 ALJ Dec. 6; *see also id.* at 5 (mentioning the ALJ's finding, in 2004, that plaintiff's subjective testimony was not fully credible); 2004 ALJ Dec. 6 (noting, in her credibility analysis, that "the two isolated MRIs of [plaintiff's] spine do not disclose herniated disks, compressed and inflamed nerve roots, vertebral fractures, annular tears, significant impingement of the spinal cord, or any other condition capable of causing the debilitating pain alleged. As Dr. Nelson said, the majority of people have bulging disks").) The relevant inquiry was not whether, in general, bulging discs and mild impingement of the spinal cord was likely to cause disabling pain, but whether bulging discs, mild impingement of the spinal cord, and severe obesity were, in combination, likely to cause disabling pain.

The Commissioner argues that the ALJ adequately accounted for all of plaintiff's obesity-related limitations by "limiting her to sedentary work, or work which involves mostly sitting, and lifting no more than 10 pounds at a time." (Def.'s Resp. 5.) Plaintiff, however, alleges that her pain, caused in part by her obesity, prevents her from doing even sedentary work. Because the ALJ did not explain her reasoning in concluding that plaintiff's obesity did not preclude her from performing sedentary activities such as sitting for long periods of time, it is impossible to determine whether the ALJ's ultimate RFC determination was based on substantial evidence.

The Commissioner also notes that plaintiff's obesity preceded her alleged date of disability onset and that plaintiff "performed her previous jobs even though she was obese."

(Def.'s Resp. 5 n.1.) The ALJ did not refer to either of these considerations in her 2004 or 2007 RFC determinations. Moreover, these considerations relate only to the effects of obesity alone, not in combination with plaintiff's alleged degenerative disc impairments. Plaintiff claims that obesity not only limits her ability to stand and move around but also exacerbates her musculoskeletal impairments.

In some situations, it may be sufficient if the ALJ's RFC determination is supported by medical evidence that takes plaintiff's obesity into account. *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (where ALJ relied on opinions of doctors who considered the claimant's obesity and claimant did not raise obesity as an impairment before the ALJ, ALJ was not required to explicitly address obesity in his determination); *Martin v. Comm'r of Soc. Sec.*, No. 09-2440, 2010 U.S. App. LEXIS 4932, at *10 (3d Cir. Mar. 8, 2010). That is not the case here. My decision in 2006 that the ALJ had not adequately considered obesity at the RFC stage, in which I explicitly cited and discussed *Rutherford*, necessarily implied that the ALJ's 2004 determination was not sufficiently supported by medical opinion evidence that took plaintiff's obesity into account. Moreover, the only medical testimony that the ALJ cited in support of her 2007 RFC determination was that of Dr. Goldman, which the ALJ rejected insofar as it stated that plaintiff's obesity did not exacerbate her neck or back symptoms.[8] (*See* R. 689-90; 2007 ALJ Dec. 6.)[9] As a

---

[8] I note that, although plaintiff questioned Dr. Goldman regarding the effects of plaintiff's obesity on her ability to expend effort during the functional capacity evaluation, Dr. Goldman considered that question to be outside the scope of his review. (*See, e.g.*, R. 688 (stating that obesity may have influenced plaintiff's failure to expend maximal effort "from the medical rather than the orthopedic" point of view but "I'm here as an orthopedic surgeon").) The ALJ also prevented Dr. Goldman from answering plaintiff's question as to whether obesity can exacerbate plaintiff's musculoskeletal pain, citing Dr. Goldman's previous testimony that, if obesity alone were an impairment, the "whole front line of the Dallas Cowboys would all qualify for being overweight and impaired." (*See* R. 708, 702.)

[9] The Commissioner also argues that the opinions of state agency physicians, Dr. Patterson and Dr. Kushner, support the ALJ's RFC determination, but the ALJ did not cite to

result, the ALJ's RFC determination was not based on medical opinions that took plaintiff's obesity into account.

I conclude that the ALJ's determination failed to discuss the effects of plaintiff's obesity, including the interaction between plaintiff's obesity and her orthopedic impairments, in terms that were sufficiently detailed and explicit to satisfy the requirements of S.S.R. 02-01p. On remand, the ALJ is once again directed to explain how she assessed the effects of plaintiff's obesity and how her function-by-function RFC analysis accounts for those effects.

### C. The ALJ's Credibility Determination

Plaintiff objects that, in the ALJ's 2007 decision, the ALJ "did not provide any new rationale or discussion for her finding as to the Plaintiff's credibility, but simply notes that she 'was not particularly impressed with the claimant's veracity and the state of her health between May 1996 and December 2001.'" (Pl.'s Obj. 4 (quoting 2007 ALJ Dec. 5).) Plaintiff also argues that, because Dr. Goldman did not review plaintiff's prior testimony, his opinion could not support the ALJ's credibility determination.[10]

_____

those opinions in either her 2004 or her 2007 decisions. Moreover, neither of those doctors appears to have examined plaintiff or considered plaintiff's obesity in his assessment. (R. 205-06, 315-22.)

[10] The Commissioner argues that plaintiff "did not fully explore this issue in her opening brief" and has therefore "waived this argument and the court should not consider it." (Def.'s Resp. 7 (citing _Warren G. ex rel Tom G. v. Cumberland County Sch. Dist._, 190 F.3d 80, 84 (3d Cir. 1999)).) Plaintiff briefly referred to the ALJ's credibility determination in her opening brief, when she concluded that the ALJ's characterization of Dr. Goldman's testimony "and by extension [the ALJ's] reliance on that testimony [was] simply inadequate to reject the opinions of Drs. Sadek and Goldstein, as well as to form a basis for finding the plaintiff to be less than credible." (Pl.'s Br. 19.) As a result, I conclude that plaintiff has not waived her objection to the ALJ's credibility determination to the extent that it was not supported by Dr. Goldman's testimony.

Although the ALJ's 2007 decision did not provide a new explanation of her credibility determination,[11] the ALJ's 2004 decision, which she incorporated by reference into her 2007 decision, provides further support for her credibility determination. In that decision, the ALJ cited substantial evidence contradicting plaintiff's testimony. For example, the ALJ noted that plaintiff complained of worsened pain after 2000 even though her medical records did not show any worsening in her underlying condition since 2000 and plaintiff had not been prescribed any medications that were indicated for the treatment of severe pain. (2004 ALJ Dec. 6.) The ALJ also noted that plaintiff demonstrated submaximal effort during a functional capacity evaluation and that, despite her testimony that she was unable to sit for more than 20 minutes at a time, she sat for over one hour during her hearing. (*Id.*)

Plaintiff objected to the ALJ's initial credibility determination to the extent that it was influenced by improper medical expert testimony at the 2004 hearing. I reversed the 2004 decision based in part on that improper testimony. I did not, however, conclude in 2006 that the ALJ lacked substantial evidence for a finding of less than full credibility. I merely noted that it was "unclear how much [the ALJ's] findings in the decision were influenced by the ME's improper testimony." *Holmes*, 2006 U.S. Dist. LEXIS 79826, at *33. By incorporating the 2004 credibility

---

[11] In her 2007 decision, the ALJ conclusorily stated that she was "not particularly impressed with the claimant's veracity and the state of her health between May 1996 and December 2001." (2007 ALJ Dec. 5.) Ordinarily such a statement would be insufficient to allow meaningful review. The ALJ may not reject the plaintiff's testimony solely by stating that the plaintiff is "not credible" but must instead give "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Soc. Sec. Admin., Policy Interpretation Ruling, S.S.R. No. 96-7p (1996); *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999) ("'[T]he adjudicator is not free to accept or reject [an] individual's complaints solely on the basis of . . . personal observations. Rather, in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence . . . .'") (quoting Soc. Sec. Admin., Policy Interpretation Ruling, S.S.R. No. 95-5p (1995)).

analysis by reference into her 2007 determination, the ALJ implicitly clarified that, even if Dr.

Askin's testimony were not considered, she would have arrived at the same conclusion as to

plaintiff's credibility. Indeed, substantial evidence supported the ALJ's finding that plaintiff was

less than credible. Plaintiff had required only conservative treatment for her pain, had testified to

greater limitations than the ALJ observed her to have at the hearing, and demonstrated

submaximal effort during a functional capacity evaluation.[12] I will therefore overrule plaintiff's

objection to the ALJ's evaluation of plaintiff's credibility.

### D. Plaintiff's Examining Physicians

Plaintiff objects that the ALJ failed, in her 2007 decision, to provide substantial evidence

for her rejection of the opinions of her examining physicians, Dr. Sadek and Dr. Goldstein.[13]

Plaintiff objects that the ALJ failed to identify any evidence contradicting those doctors' opinions

as to plaintiff's limitations. I conclude that substantial evidence supported the ALJ's decision to

give less than full weight to the opinions of Dr. Sadek and Dr. Goldstein.

After finding that a claimant's medically determinable impairments could reasonably lead

to a claimant's alleged symptoms, as the ALJ did in her 2007 decision (2007 ALJ Dec. 5), the ALJ

may only reject medical evidence that supports a claimant's alleged symptoms if the evidence is

internally inconsistent or inconsistent with other substantial evidence. *Smith*, 637 F.2d at 972; *see*

*also* 20 C.F.R. § 404.1527(c)(1). Here, the ALJ based her rejection of Dr. Sadek's and Dr.

---

[12] Some apparent inconsistencies, such as the fact that plaintiff testified to worse pain than would ordinarily be expected of someone with her relatively mild orthopedic impairments, may be reconcilable through proper consideration of plaintiff's obesity. Even if such inconsistencies are disregarded, substantial evidence still supports the ALJ's finding that plaintiff was less than fully credible.

[13] In my 2006 opinion, I concluded that the ALJ's rejection of these physicians' opinions in her 2004 decision was not supported by substantial evidence because it impermissibly relied on the ALJ's own lay opinions. *See Holmes*, 2006 U.S. Dist. LEXIS 79826, at *22-26.

Goldstein's opinions on the testimony of Dr. Goldman, a board-certified orthopedic surgeon who had reviewed plaintiff's medical records. (2007 ALJ Dec. 5-6.) Dr. Goldman testified that plaintiff's physicians did not refer her to an orthopedic specialist, conduct extensive testing, or recommend aggressive treatment, which a physician would ordinarily be expected to do when treating a patient with a severe orthopedic impairment. He opined that plaintiff's symptoms were probably not caused by an orthopedic impairment such as an impairment of the cervical or lumbar spine.[14] He further testified that plaintiff's examining physicians failed to provide support for their conclusions regarding plaintiff's restrictions and their origins.[15] This testimony contradicts Dr. Sadek's and Dr. Goldstein's opinions that plaintiff suffered severe functional limitations as a result of her spinal impairments, thus constituting substantial evidence supporting the ALJ's rejection of those opinions.[16]

---

[14] Dr. Goldman suggested that plaintiff's limitations may instead have been caused by impairments such as diabetic neuropathy, Epstein-Barr virus, or thyroid dysfunction. (R. 701-02.) Plaintiff argues that, even if this testimony were to be believed, it would not be legally relevant because the source of plaintiff's limitations should not affect the ALJ's RFC determination. A claimant's RFC, however, reflects only those limitations that are caused by the claimant's *medically determinable impairments*. S.S.R. 96-8p. Although the ALJ did not make specific findings regarding plaintiff's medically determinable impairments in her 2007 determination, her 2004 determination, which the ALJ incorporated by reference into the 2007 determination, states that plaintiff's medically determinable impairments were "cervical spine, lumbar spine, and obesity conditions." (2004 ALJ Dec. 3.) As a result, the ALJ may only consider the effects of those conditions when determining plaintiff's RFC.

[15] Plaintiff apparently believes that Dr. Goldman objected only to Dr. Sadek's failure to "numerically quantify" his findings as to plaintiff's deficits, and argues that Dr. Sadek did numerically quantify his findings when asked. (Pl.'s Obj. 2.) To the contrary, Dr. Goldman also questioned many of Dr. Sadek's numeric quantifications of plaintiff's deficits, noting that they appeared to be merely estimates arrived at by "eyeballing" plaintiff's symptoms rather than actually measuring them. (R. 690.) Dr. Sadek does appear to have recorded actual measurements of plaintiff's range of motion in a note from May 29, 2003 (*see* R. 527), but this one observation still does not include a comparison of right and left, which Dr. Goldman testified was also important (R. 690).

[16] I note that Dr. Goldman's opinion does not provide sufficient support for the ALJ's ultimate RFC determination. As noted above, the ALJ concluded that plaintiff also suffered from

### E. Adoption of Previous RFC

Finally, plaintiff objects that the ALJ's RFC determination failed to include a function-by-function analysis of plaintiff's impairments as required by S.S.R. 96-8p. Plaintiff alleges that the ALJ was not entitled to adopt her previous RFC determination from 2004 because that determination was based in part on improper medical expert testimony by Dr. Askin. Plaintiff also notes that the ALJ's RFC determination in 2007 was actually less restrictive than the ALJ's determination in 2004, which restricted plaintiff to sedentary work with a sit-stand option.

In my 2006 memorandum opinion, I concluded that the testimony of a medical expert, Dr. Askin, relied on an improper standard of disability. *Holmes*, 2006 U.S. Dist. LEXIS 79826, at *32. Although the ALJ "also assessed Holmes' residual functional capacity by examining the record and medical evidence," it was "unclear how much [the ALJ's] findings in the [2004] decision were influenced by [Dr. Askin's] improper testimony." *Id.* at *33. I therefore remanded the matter to the ALJ to reevaluate Dr. Askin's testimony.

On remand, the ALJ re-adopted her previous RFC determination without conducting a new function-by-function analysis. She made no mention of Dr. Askin's testimony. Had the ALJ's 2004 RFC determination been otherwise supported by substantial evidence, her failure to conduct a new function-by-function analysis may have been justifiable, as the new determination could be read as implicitly stating that the ALJ did not consider Dr. Askin's testimony to be essential to her original analysis. Unfortunately, as discussed in greater detail *supra*, the 2004 RFC determination was not based on substantial evidence as it did not account for the effects of plaintiff's obesity, and the

---

obesity, a medically determinable impairment that could also have caused limitations and exacerbated her orthopedic limitations. Although Dr. Goldman testified that plaintiff's obesity did not cause any limitations, that conclusion was based on the premise that plaintiff did not suffer from any limitations in motion, a premise that the ALJ specifically rejected. (2007 ALJ Dec. 7.)

2007 decision did not adequately remedy that failure. As a result, the ALJ was required to conduct a new function-by-function RFC analysis, at least with respect to the functions that plaintiff claims are impaired by her obesity, *i.e.*, standing, walking, and ability to exert sustained effort throughout the day. (*See* R. 160.)

## IV. Conclusion

I conclude that the ALJ's determination lacked substantial evidence to support it because the ALJ failed, for a second time, to address in sufficient detail (1) the interaction between plaintiff's obesity and her orthopedic impairments and (2) the effects of plaintiff's obesity on her RFC. I will therefore remand the matter to the Commissioner for further proceedings consistent with this memorandum.[17]

---

[17] Plaintiff urges that, in lieu of remand, the court enter judgment in her favor. A court may enter judgment in favor of a claimant where "substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits" and further proceedings "would result only in further delay in the receipt of benefits." *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). As the magistrate judge noted, there is substantial unfavorable evidence in plaintiff's record. Moreover, plaintiff is currently receiving social security disability benefits. (*See* Pl.'s Obj. 6.) She began receiving them in 2001, when the Social Security Administration issued a favorable decision, and apparently continued to receive them after that initial decision was reopened. (R. 136-37.) I therefore easily conclude that remand is appropriate. In light of the ALJ's failure on remand to address issues that I identified in my 2006 opinion, and in the interest of bringing a swift conclusion to this nearly fourteen-year-old claim, the Commissioner may choose to assign this matter to a different ALJ.